# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Liberty Mutual Fire Insurance Company, LM Insurance Corporation, LM General Insurance Corporation, The First Liberty Insurance Corporation, Safeco Insurance Company of Indiana, and Safeco Insurance Company of Illinois, <br><br> Plaintiffs, <br><br> v. <br><br> Acute Care Chiropractic Clinic P.A., Arthur Guzhagin D.C., Healthy Living Chiropractic Clinic P.C., Lake Nicollet Clinic P.A., Midwest Chiropractic Clinic P.C., Najah Ibrahim, Southwest Management LLC, and St. Paul Wellness Clinic P.A., <br><br> Defendants. | Case No. 14-cv-2651 (SRN/HB) <br><br><br><br><br> **MEMORANDUM OPINION AND ORDER** |

Travis J. Adams and Bryan J. Chant, Law Offices of Thomas P. Stilp, 701 Xenia Avenue South, Suite 220, Golden Valley, Minnesota 55416, for Plaintiffs.

Adam A. Gillette and Douglas L. Elsass, Fruth, Jamison & Elsass, 3902 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402, for Defendants Acute Care Chiropractic Clinic P.A., Arthur Guzhagin D.C., Healthy Living Chiropractic Clinic P.C., Lake Nicollet Clinic P.A., St. Paul Wellness Clinic P.A., and Midwest Chiropractic Clinic P.C.

Leny K. Wallen-Friedman, Paul M. Floyd, and Diana Young Morrissey, Wallen-Friedman & Floyd, P.A., 527 Marquette Ave., Suite 860, Minneapolis, MN 55402, for Defendants Najah Ibrahim and Southwest Management LLC.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendants Acute Care Chiropractic Clinic P.A.,

Arthur Guzhagin D.C., Healthy Living Chiropractic Clinic P.C., Lake Nicollet Clinic P.A.,

Midwest Chiropractic Clinic P.C., and St. Paul Wellness Clinic P.A.'s (collectively,

"Defendants") Motion to Dismiss [Doc. No. 8].  For the reasons set forth below, the motion

is denied.

## II.    BACKGROUND

In 1974, the State of Minnesota enacted the Minnesota No-Fault Automobile

Insurance Act, or the "No-Fault Act", in order to facilitate the orderly and efficient

administration of justice within the state, in response to the detrimental impact of

automobile accidents on uncompensated injured persons.  See Minn. Stat. § 65B.42 (2014).

The No-Fault Act calls for a minimum payment of $20,000 in medical expense benefits and

$20,000 in income loss, replacement services loss, funeral expense loss, survivor's

economic loss, and survivor's replacement services loss benefits to victims of automobile

accidents, without regard to fault for the accident.  See Minn. Stat. § 65B.44, subd. 1.

Victims of motor vehicle accidents who are seeking medical treatment for their injuries are

required to submit benefit applications with their primary insurance companies.  See Minn.

Stat. § 65B.55, subd. 1.

### A.  The Parties

Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, LM

General Insurance Corporation, The First Liberty Insurance Corporation, Safeco Insurance

Company of Indiana, and Safeco Insurance Company of Illinois are insurance companies

that do business in the State of Minnesota and issue policies that conform to the No-Fault

Act.  See Minn. Stat. § 65B *et. seq.*  (Compl. ¶ 4 [Doc. No. 1].)

Defendants Acute Care Chiropractic Clinic P.A., Healthy Living Chiropractic

Clinic P.C., Lake Nicollet Clinic P.A., Midwest Chiropractic Clinic P.C., and St. Paul

Wellness Clinic P.A [hereinafter, "Defendant Clinics"], are health clinics and providers

who provide chiropractic care for car accident victims (id. ¶ 26), and submit patient bills to

Plaintiffs pursuant to the No-Fault Act (id. ¶ 43).  Dr. Arthur Guzhagin is a licensed

chiropractor in the State of Minnesota and is the "paper owner" of the Defendant Clinics. [1]

(Id. ¶ 16.)  Najah Ibrahim is a layperson, who is a citizen of Minnesota, and is not a licensed

medical professional.[2]  (Id. ¶ 19.)  Southwest Management, LLC [hereinafter, "Southwest

Management"] is a lay, limited liability company, whose sole member is Ibrahim.  (Id. ¶

---

[1]     Pursuant to Minnesota law, "a corporate officer is not liable for the torts of the corporation's employees unless he participated in, directed, or was negligent in failing to learn of and prevent the tort."  Morgan v. Eaton's Dude Ranch, 239 N.W.2d 761, 762 (Minn. 1976).  Since Plaintiffs allege that Dr. Guzhagin directly participated in the fraudulent scheme (see Compl. ¶¶ 16, 29, 37, 77, 90, 97, 112, 119, 125 [Doc. No. 1]), the Court need not dismiss Plaintiffs claims against Dr. Guzhagin merely because Dr. Guzhagin is the "paper owner" of Defendant Clinics.

[2]     Minnesota courts have applied the same principle that was described in note 1 to officers of an LLC.  See SCA License Corp. v. West Builders, LLC, No. A10-1462, 2011 WL 1642570, at *5 (Minn. Ct. App. May 3, 2011) (holding that the district court did not abuse its discretion for finding that an officer of an LLC was personally liable for the LLC's activity because the LLC was "simply [the officer's] alter-ego").  Therefore, Plaintiffs' claims against Ibrahim also do not require dismissal simply because Ibrahim is the sole member of Southwest Management, LLC.

20.)

## B.  Defendants are Allegedly "Associated-in-Fact"

This lawsuit arises from Defendant Clinics allegedly fraudulently billing Plaintiffs

for medical treatment provided to car accident victims.  Plaintiffs claim that while each

clinic is legally incorporated separately, Defendants are "associated-in-fact."  (Id. ¶ 53.)  Or,

in other words, Defendants are allegedly run as a single enterprise.  Plaintiffs allege that

Defendants "colluded [in order] to submit illegal and unlawful charges to insurance carriers,

including Plaintiffs."  (Id.)

Specifically, Plaintiffs claim that:

Upon information and belief, Defendant Clinics are operated in a
consolidated fashion . . . [as] Defendant Clinics commingle funds between
their various financial accounts, operate in an underfunded fashion and pay
expenses for one clinic from another clinics operating account, use same or
similar electronic patient care record systems, grant direct and indirect access
to confidential patient care records to chiropractors working at other
Defendant Clinics.

(Id. ¶ 25.)

To support their claim that Defendant Clinics are run in an underfunded fashion,

Plaintiffs allege that the "Defendant Clinics do not pay practice relief physicians for services

rendered."  (Id. ¶ 41.)  In fact, Plaintiffs claim that "Defendant Clinics require [] employee

chiropractors [to] pay practice relief physicians from their personal financial accounts."

(Id.)  As an example, Plaintiffs allege that Confidential Informant 4 [hereinafter, "CI-4"], a

practice relief physician employed by Acute Care, was paid by Giles from Giles' personal

checking account.  (Id. ¶ 38.)

Plaintiffs support their claim that Defendant Clinics are a single enterprise with several alleged facts.  First, Plaintiffs allege that the interconnected relationship between all Defendant entities is demonstrated by the fact that a single clinic's employees receives payment from a different clinic or entity, for whom the employee does not actually work.  (See id. ¶ 36.)  For instance, Confidential Informant 3 [hereinafter, "CI-3"] was hired to serve as a full-time physician at Healthy Living, Midwest Chiropractic, and St. Paul Wellness.  (Id.)  CI-3 was allegedly paid by certain Defendant Clinics for services that he rendered while working at a completely different Defendant Clinic.  Specifically, (1) St. Paul Wellness, (2) Southwest Management, (3) Healthy Living, and (4) Midwest Chiropractic, allegedly paid CI-3 for chiropractic services that he actually rendered *only* at St. Paul Wellness.  (Id.)  Moreover, although he was never employed by Southwest Management, Southwest Management issued an IRS-1099 tax form to CI-3 for his work at St. Paul Wellness.  (Id. ¶ 40.)

To further substantiate their claim that Defendants are associated-in-fact, Plaintiffs claim that Brooke Giles, a licensed chiropractor and employee of Dr. Guzhagin, provided deposition testimony on November 22, 2013, in the matter of Ali v. Safeco Insurance Company, wherein she confirmed that at least three of the Defendant Clinics are "one in the same."  (Id. ¶ 37.)  Giles discussed the singular, overarching ownership structure of Acute Care, Midwest Chiropractic, and Lake Nicollet, while also explaining that these three facilities share access to patient health care records.  (Id.)

### C. Defendant Clinics are Allegedly Owned by Layperson Defendant Ibrahim and/or Lay Company Defendant Southwest Management

In addition to alleging that Defendant Clinics are associated-in-fact, Plaintiffs claim that although Defendant Guzhagin incorporated and legally owns each Defendant Clinic, Defendant Clinics are *actually* owned by lay person Ibrahim and/or his corporation Southwest Management.  (Id. ¶ 25.)

Plaintiffs bolster their allegation about Ibrahim's ownership-in-fact by describing Ibrahim's relationship with the Defendant Clinics.  Specifically, Plaintiffs allege that "Ibrahim and/or Southwest Management is an established 'marketer' or runner having operated services such as 1-800-PAIN-TEAM and promotes the Defendant Clinics by bringing new patients to the Defendant Clinics for treatment after motor vehicle accidents." (Id. ¶ 26.)  In fact, Confidential Informant 1 [hereinafter, "CI-1"] stated that as an employee of Healthy Living Chiropractic, he was aware that Ibrahim worked as a "marketer" for that clinic.  (Id. ¶ 34.)  However, Minnesota law prohibits Defendant Clinics from employing a "runner", or someone "who for a pecuniary gain directly procures or solicits prospective patients . . . at the direction of, or in cooperation with, a health care provider when the person knows or has reason to know that the provider's purpose is to perform or obtain services or benefits under or relating to a contract of motor vehicle insurance."  (Id. ¶ 28 (citing Minn. Stat. § 609.612 (2013).)

Chiropractors who work for the Defendant Clinics are allegedly told that Ibrahim is a "friend of Guzhagin."  (Id. ¶ 26.)  For instance, Giles stated in deposition testimony in

another case that Ibrahim was a friend of Guzhagin and would refer patients to the clinics. (Id. ¶ 37.)  Additionally, "Ibrahim is [allegedly] granted access to office space at the Defendant Clinics and is considered by the Confidential Informants to have influence on the management and operation of the clinics."  (Id. ¶ 26.)

Plaintiffs further allege that Defendant Guzhagin affirmatively misrepresented that the Defendant Clinics were operated separately and owned solely by Dr. Guzhagin.  (See id. ¶ 61.)  They claim that Dr. Guzhagin wrote, in an undated letter to Michael Struebing of Liberty Mutual Insurance Company, that "I am the sole owner of the clinics.  You also asked whether the facilities work in conjunction with one another or are operated separately. The clinics are operated separately."  (Id.)  Although the letter was undated, Struebing allegedly received this letter on July 11, 2013.  (Id.)

Plaintiffs claim that Ibrahim's alleged ownership of the clinics violates the Corporate Practice of Medicine Doctrine ("CPMD"), which prohibits chiropractic clinics from being owned in whole, or part, by unlicensed laypersons.  See, e.g., Isles Wellness, Inc. v. Progressive N. Ins. Co., 725 N.W.2d 90, 95 (Minn. 2006) [hereinafter, "Isles II"]; Isles Wellness, Inc. v. Progressive N. Ins. Co., 703 N.W.2d 513, 517 (Minn. 2005) [hereinafter, "Isles I"]; Granger v. Adson, 250 N.W. 722 (Minn. 1933).  Moreover, Plaintiffs argue that Defendant Guzhagin was aware of the CPMD and knowingly violated it because: (1) the Minnesota Board of Chiropractic Examiners released a notice in January 1999, explaining that all owners and decision makers of professional firms must be comprised of persons licensed to practice those services; and thus, he was likely aware of this notice when he

acquired his chiropractic license on February 1, 2006 (see Compl. ¶ 59 [Doc. No. 1]); and

(2) Defendant Guzhagin acknowledged the CPMD in Guzhagin v. State Farm Mut. Auto.

Ins. Co., 566 F. Supp. 2d 962, 970 n.8 (D. Minn. 2008), a previous lawsuit to which he was

a party (see Compl. ¶ 59 [Doc. No 1]).

Defendant Clinics submitted patient bills to Plaintiffs on Health Insurance Claim

Forms or HCFA-1500 forms.  (Compl. ¶ 43 [Doc. No. 1].)  Plaintiffs allege that Defendants

represented, by submitting HCFA-1500 forms, that: "(1) the services on the form were

medical indicated [sic] and necessary for the health of the patient; (2) the services were

personally furnished by that medical provider or by a qualified employee under the medical

provider's personal direction; and [most importantly,] (3) the medical provider was

authorized to perform such services."  (See Compl. ¶ 43 [Doc. No. 1].)

In relevant part, the HCFA-1500 form contains two separate notices.  One warns

that: "[a] person who knowingly files a statement of claim containing any

misrepresentation or any false, incomplete or misleading information may be guilty of a

criminal act punishable under law and may be subject to civil penalties."  (See Gillette

Aff., Ex. A [Doc. No. 19-1].)  The other notice pertains specifically to physicians or

suppliers completing the form and states that "[a]ny one who misrepresents or falsifies

essential information to receive payment from Federal funds requested by this form may

upon conviction be subject to fine and imprisonment under applicable Federal laws."

(See id.)  Plaintiffs contend that by completing the physician or supplier information on

the HCFA-1500 forms, Defendants implied that they were eligible for reimbursement, and that they were not operating in violation of Minnesota law or the CPMD.

According to Plaintiffs, each claim form Defendants submitted was fraudulent because each form contained misleading information, insofar as it implied that the clinics were lawfully owned and operated, and therefore, eligible for reimbursement under the No-Fault Act.  (See Compl. ¶ 43 [Doc. No. 1].)  In addition to Defendants allegedly misrepresenting their essential ownership information on federal forms, Defendant Guzhagin allegedly lied to Plaintiffs more directly.  Plaintiffs allege that, on July 11, 2013, Defendant Guzhagin directly stated to Plaintiffs in a letter that he is the sole owner of the clinics.  (See id. ¶ 63 [Doc. No. 1].)

HCFA-1500 forms, as well as supporting documentation, were sent to Plaintiffs via United States Postal Service, facsimile, and/or wire.  (Id. ¶¶ 44, 60–63.)  Plaintiffs allege that Defendants unlawfully billed Plaintiffs over $834,060 because the clinics are owned, at least in part, by a layperson or lay company.  (Id. ¶ 6.)  Plaintiffs explain that Defendants' alleged misrepresentation was "material because the information submitted to Plaintiffs . . . largely determined whether Plaintiffs would voluntarily issue payment."  (Id. ¶ 114.)  In other words, Plaintiffs would have not issued payment for the bills submitted by Defendants if they knew of Defendants' alleged corporate practice of medicine.

### D.  Additional Facts Alleged

Unrelated to Plaintiffs' claims of corporate ownership and fraud stemming from Defendants' corporate ownership, Plaintiffs allege several other facts.  Plaintiffs claim that

"Defendant Clinics attempt to treat accident victims regardless of injury status," and on at least one occasion, a patient reported that a chiropractor at Midwest Chiropractic deliberately intended to injure the patient's neck in order to substantiate an insurance claim. (Id. ¶ 33.)

Plaintiffs also allege that according to Confidential Informant 2 [hereinafter, "CI-2"], Dr. Guzhagin "would attempt to influence her treatment recommendations by making comments to her about the treatment that she had rendered without ever personally treating the patient." (Id. ¶ 35.) Similarly, Plaintiffs note that Defendant Clinics treated patients "unnecessarily and/or without objective evidence of injury." (Id. ¶ 33.) Thus, Plaintiffs appear to allege that some unidentified number of claims by unidentified patients at unidentified clinics were not medically necessary. (See id.)

Finally, Plaintiffs claim that Dr. Guzhagin "has been involved in other schemes to knowingly and intentionally violate the corporate practice of medicine." (Id. ¶ 45.) Plaintiffs' discussion of Dr. Guzhagin's former fraud scheme, which was allegedly perpetrated in 2009 in conjunction with a non-board certified doctor, is not directly relevant to the facts pertaining to this case. Plaintiffs' claim about poor or unnecessary treatment that occurs at Defendant Clinics is also not directly relevant to Plaintiffs' allegation of Defendants' corporate ownership. Rather, it appears that Plaintiffs include these allegations to demonstrate that it is plausible that Dr. Guzhagin is involved in a fraudulent scheme in this case, since he allegedly recommended unnecessary medical treatments and was involved earlier in a similar fraud scheme. (See id.)

### E.  Procedural Posture and Plaintiffs' Claims

Plaintiffs filed their Complaint on July 2, 2014.  (<u>See generally</u> Compl. [Doc. No. 1].)  Plaintiffs' Complaint is based upon eight causes of action.  In Count I, Plaintiffs allege that Defendants engaged in mail fraud and wire fraud in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.*, by submitting bills to Plaintiffs by mail and by wire under the false pretense that Defendant Clinics were properly incorporated, properly owned, and legally authorized to render treatment in the State of Minnesota.  (<u>Id.</u> ¶¶ 46–68.)  In Count II, Plaintiffs claim that Defendants violated the CPMD, which prohibits chiropractic clinics from being owned in whole, or in part, by unlicensed laypersons.  (<u>Id.</u> ¶¶ 69–78.)  In Count III, Plaintiffs allege that Defendants violated the Minnesota Professional Firms Act by issuing and/or authorizing legal, or in-fact, ownership interests to persons and/or limited liability companies not licensed to render at least one category of the pertinent professional services.  (<u>Id.</u> ¶¶ 79–91.)  In Count IV, Plaintiffs claim that Defendants would be unjustly enriched if the Court permits them to retain funds received through violations of the CPMD and the Minnesota Professional Firms Act.  (<u>Id.</u> ¶¶ 92–97.)

In Count V, Plaintiffs seek to recover the Minnesota No-Fault benefits they paid as a result of Defendants' alleged intentional misrepresentations regarding their lay ownership.  (<u>Id.</u> ¶¶ 98–104.)  In Count VI, Plaintiffs allege that Defendants violated the Minnesota Consumer Protection Act, Minn. Stat. § 325F, by utilizing false information and/or deceptive practices when they represented that they were properly owned and

legitimate.[3]  (Id. ¶¶ 105–12.)  In Count VII, Plaintiffs contend that Defendants engaged in common law fraud by falsely representing that the services they performed for Plaintiffs' insureds were legal and proper, when, in fact, Defendants were aware that their operations were in violation of Minnesota law.  (Id. ¶¶ 113–19.)  Finally, in Count VIII, Plaintiffs allege that Defendants engaged in negligent misrepresentation by failing to use reasonable care or competence in communicating billing information to Plaintiffs, because Defendants falsely represented to Plaintiffs that they were not lay-owned and not operating in violation of Minnesota law.[4]  (Id. ¶¶ 120–25.)

Plaintiffs allege that Defendants are jointly and severally liable for Counts II through VIII because Defendants acted in a common scheme and plan to defraud Plaintiffs.  (See id. ¶¶ 77, 90, 97, 104, 112, 119, 125.)  Accordingly, Plaintiffs seek to enjoin the clinics from operating in violation of law (id. at 34), and they seek to recover an amount in excess of $75,000 from Defendants for amounts paid or billed (id. ¶ 6).

Defendants filed a Motion to Dismiss Plaintiffs' Complaint on September 2, 2014 [Doc. No. 8], along with a supporting memorandum [Doc. No. 18], and an affidavit with an attached exhibit [Doc. No. 19].  Plaintiffs filed an opposition memorandum on October 20, 2014 [Doc. No. 20], with a declaration and an attached exhibit [Doc. No. 21].  Defendants

---

[3]    Plaintiffs allege that they have the authority to bring this cause of action pursuant to the Minnesota Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a (2013). (Id. ¶¶ 105–112.)

[4]    One allegation in the fact section of Plaintiffs' Complaint describes some treatments made by practitioners at the Defendant Clinics as medically unnecessary.  (Id. ¶ 33.)  However, the Court does not read this single allegation as forming the basis of Plaintiffs' claims.  (See Defs.' Mem. at 21 [Doc. No. 18].)  Rather, Plaintiffs' claims are more clearly based upon the legality of the Defendant Clinics' ownership structure.

filed a reply brief on October 27, 2014 [Doc. No. 22], and the matter was heard on November 10, 2014 [Doc. No. 23].  Plaintiffs filed a supplemental opposition memorandum on November 13, 2014 [Doc. No. 24].

### III.    DISCUSSION

#### A.    Standard of Review

Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).  (See Defs.' Mot. to Dismiss [Doc. No. 8].)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for lack of subject matter jurisdiction.  When considering a Rule 12(b)(1) motion, a district court may consider matters outside the pleadings.  Satz v. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980).  "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."  Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990).  Federal district courts have subject matter jurisdiction over civil actions that involve a federal question or diversity of citizenship.  See 28 U.S.C. §§ 1331–1332.  Federal question jurisdiction exists when the action arises "under the Constitution, laws, or treaties of the United States."  Id. § 1331.

Diversity jurisdiction exists when the case is between citizens of different states and the amount in controversy exceeds $75,000.  Id. § 1332(a).

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to Plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).  However, the Court need not accept as true wholly conclusory allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions Plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).  In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss.  See Fed. R. Civ. P. 12(d).  The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007).[5]

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  Id. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly.  Ashcroft v. Iqbal, 556 U.S.

---

[5]     Although Plaintiffs did not attach an HCFA-1500 form to their Complaint, Plaintiffs discussed the form throughout their Complaint and Defendants submitted a copy of this federal claim form.  (See Gillette Aff., Ex. A [Doc. No. 19-1].)  Therefore, the Court properly considers the entirety of the HCFA-1500 form in this order.

662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at 555).  In sum, this standard "calls for enough

fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."

<u>Twombly</u>, 550 U.S. at 556.

With respect to Plaintiffs' claims that are based on fraud, Plaintiffs' pleading

standard is heightened.  According to Federal Rule of Civil Procedure 9(b), a plaintiff must

plead claims of fraud with particularity.  <u>See</u> Fed. R. Civ. P. 9(b).  In order to satisfy Rule

9(b)'s particularity requirement, "the complaint must plead such facts as the time, place,

and content of the defendant's false representations, as well as the details of the

defendant's fraudulent acts, including when the acts occurred, who engaged in them, and

what was obtained as a result."  <u>United States ex rel. Thayer v. Planned Parenthood of the

Heartland</u>, 765 F.3d 914, 916 (8th Cir. 2014) (quoting <u>United States ex rel. Joshi v. St.

Luke's Hospital, Inc.</u>, 441 F.3d 552, 556 (8th Cir. 2006)).  In other words, "the complaint

must identify the 'who, what, where, when, and how' of the alleged fraud."  <u>Id.</u> (quoting

<u>Costner v. URS Consultants, Inc.</u>, 153 F.2d 667, 677 (8th Cir. 1998)).

Below, the Court begins by addressing whether each of Plaintiffs' claims survives

Defendants' Motion to Dismiss pursuant to Rule 12(b)(6), and then the Court considers

whether jurisdiction is proper under Rule 12(b)(1) in this case, given the plausibility of

each claim.

### B.      Plausibility

#### 1.   Count I: Racketeer Influenced and Corrupt Organizations Act, 15 U.S.C. § 1961 *et. seq.*

The Racketeer Influenced and Corrupt Organizations Act ("RICO") prohibits persons "employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(a) (2012). RICO "defines 'racketeering activity' as the commission of any of several predicate offenses." Ill. Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc., No. 13-cv-2820 (PJS/TNL), 2014 WL 4104789, at *6 (D. Minn. Aug. 19, 2014).  Mail fraud and wire fraud are among the possible predicate offenses.  Id. (quoting 18 U.S.C. § 1341 (mail fraud statute), id. § 1343 (wire fraud statute)).  RICO "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011).  Although RICO is a criminal statute, the law provides a civil remedy for any person injured in his business or property by reason of a violation of the law's substantive provisions.  See 18 U.S.C. § 1964(c).

In order to plead a viable RICO claim, a plaintiff must allege: "(1) the conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." Wisdom v. First Midwest Bank of Poplar Bluff, 167 F.3d 402, 406 (8th Cir. 1999).  These elements must be pled with particularity when the alleged racketeering activity involves fraud, Crest Constr. II, 660 F.3d at 35, and must be pled with respect to each defendant individually, Craig Outdoor Adver., Inc. v. Viacom Outdoor Inc., 528 F.3d 1001, 2027 (8th Cir. 2008).

16

Here, the parties dispute whether (a) Defendants' activity constituted racketeering activity, and (b) whether Defendants collectively constitute an enterprise. The Court discusses these issues below. The Court finds that Plaintiffs adequately plead the commission of predicate acts, which form the basis of the alleged racketeering activity, and Plaintiffs plead facts showing that the alleged enterprise had a structure that was separate and distinct from the alleged racketeering activity. Therefore, Defendants' Motion to Dismiss Plaintiffs' RICO claim is denied.

### a. Racketeering Activity

Plaintiffs allege that each Defendant committed mail fraud and wire fraud by submitting fraudulent insurance claims to Plaintiffs under the No-Fault Act. (See Compl. ¶¶ 61, 63 [Doc. No. 1].) As noted above, mail fraud and wire fraud are categorized as racketeering activity. 18 U.S.C. §§ 1341, 1343. In order to state a prima facie RICO claim and demonstrate a pattern of racketeering activity, Plaintiffs must plead fraud with particularity. Illinois Farmer, 2014 WL 4104789, at *6 (citing Wisdom, 167 F.3d at 406). Here, Plaintiffs claim that Defendants deceived them because they were untruthful about the Defendant Clinics' corporate ownership.

In Minnesota, the corporate practice of medicine is not permitted. See Isles I, 703 N.W.2d at 518. This limitation exists to ensure that (1) laypersons may not commercially exploit the professional judgment of medical providers, and (2) a health care practitioner's loyalty to a patient is never in conflict with the practitioner's loyalty to an employer. See Isles II, 725 N.W.2d at 93 (quoting Isles I, 703 N.W.2d at 517). Plaintiffs argue that when

Defendants filed insurance claims with Plaintiffs, Defendants implicitly represented that they were operating in accordance with federal and state law, and thus were not lay-owned. (See Compl. ¶¶ 61, 63 [Doc. No. 1].)  However, Plaintiffs allege that Defendants' representation was fraudulent because layperson Ibrahim and/or his corporation, Southwest Management, own the Defendant Clinics in violation of Minnesota's CPMD, and such lay-ownership precludes the Defendant Clinics from being reimbursed for insurance claims under the No-Fault Act.  (Id. ¶¶ 25–26.)

In order to show that an entity commits mail fraud and/or wire fraud amounting to a RICO violation, Plaintiffs must show: "(1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme."  Wisdom, 167 F.3d at 406 (citing Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 & n.6 (8th Cir. 1995)). Accordingly, in order for a violation of Minnesota's CPMD to constitute mail fraud and/or wire fraud amounting to a RICO violation, Plaintiffs must show that (1) the CPMD was violated, (2) Defendants knew of the violation, see United States v. Redzic, 627 F.3d 683, 689 n.4 (8th Cir. 2010) (explaining that intent to defraud is an element of both mail fraud and wire fraud), and (3) Defendants committed mail or wire fraud by intentionally representing to Plaintiffs that they were not violating the CPMD when they submitted their claims via mail and wire.  See Ill. Farmers, 2014 WL 4104789, at *9.  The Court discusses these three elements below.

i.      **CPMD Violation: Owner-in-Fact Allegation**[6]

Plaintiffs allege that while Defendant Guzhagin, a licensed chiropractor, is the "paper owner" of the Defendant Clinics, the legal owner, or owner-in-fact of the clinics, is either Defendant Ibrahim, who is not licensed to practice physical medicine or chiropractic medicine in any state, or his lay company, Southwest Management.  (See Compl. ¶¶ 16, 19, 25 [Doc. No. 1].)

Defendants do not dispute that Defendant Ibrahim is not licensed to practice medicine.  Rather, they argue that Defendant Ibrahim and Southwest Management do not have any ownership interest in the clinics.  (See Defs.' Mem. at 13–14 [Doc. No. 18].) Defendants contend that Plaintiffs' allegation, that Ibrahim or Southwest Management is the owner-in-fact of the clinics, is a legal conclusion that the Court should disregard.  (See id. at 13.)  They argue that Plaintiffs' allegations are "mere conclusory statements," and therefore do not suffice under the Federal Rules of Civil Procedure.  (See id. at 14 (citing Iqbal, 556 U.S. at 678)).

---

[6]      Reading Plaintiffs' Complaint as a whole, it appears as though the underlying fraud that forms the basis of Plaintiffs' RICO claim is the alleged corporate ownership of the Defendant Clinics.  (See generally Compl. [Doc. No. 1].)  However, in a portion of Defendants' brief, Defendants analyze Plaintiffs' RICO claim insofar as the underlying alleged fraud is not the corporate ownership of the clinics, but rather the lack of medically necessary treatments rendered by professionals at the clinics.  (See Defs.' Mem. at 14 [Doc. No. 18].)

Insofar as Plaintiffs' RICO claim is based on the alleged fact that the treatment Defendants provided to patients was not medical necessary, the Court finds that this claim is not pled with the requisite specificity.  Plaintiffs merely allege that some unidentified number of claims by unidentified patients at unidentified clinics were not medically necessary.  (See Compl. ¶ 33 [Doc. No. 1].)  Therefore, the Court's analysis is focused primarily on the corporate ownership of the clinics as the basis of the alleged fraud.

The Court finds that Plaintiffs' allegations regarding ownership of Defendant Clinics amount to more than "mere conclusory statements."  Plaintiffs allege a series of facts that, read as a whole, plausibly demonstrate that Ibrahim and/or Southwest Management is a lay owner of Defendant Clinics.  These alleged facts include, but are not limited to, the following: (1) Defendant Clinics are run as a single associated-in-fact enterprise, according to Giles' previous deposition testimony, and based upon how Defendants manage their funds and pay employees (Compl. ¶¶ 25, 36, 37, 40 [Doc. No. 1]); (2) Ibrahim has a stake in the success of Defendant Clinics because he is an established "marketer" and brings new patients to the Defendant Clinics for treatment after motor vehicle accidents (id. ¶¶ 26, 34); (3) Ibrahim and Dr. Guzhagin have a close personal relationship as chiropractors employed at Defendant Clinics recognize Ibrahim as a "friend" of Dr. Guzhagin (id. ¶¶ 26, 37); (4) Ibrahim and Dr. Guzhagin have a close business relationship because Ibrahim has office space at the Defendant Clinics and is considered by the Confidential Informants to have influence on the management and operation of the clinics (id. ¶ 26); and (5) Southwest Management and Ibrahim pay licensed chiropractors for services rendered, as evidenced by the fact that Southwest Management issued payments and an IRS-1099 tax form to CI-3 for professional services rendered at St. Paul Wellness (id. ¶ 40).

An employer is typically the entity to provide an employee with payment and tax documents.  The fact that such paperwork was provided by an organization claiming to have no part in the management of the employee's place of business is sufficient "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  In opposition,

Defendants claim that "nothing in the law says that issuing a payment to one contract health-care provider makes one an owner."  (See Defs.' Reply at 2 [Doc. No. 22].)  While Defendants are correct that source of payment does not *ipso facto* indicate ownership, at this stage of the proceedings, Plaintiffs' allegations are sufficient to survive dismissal and nudge Plaintiffs' corporate ownership claim "across the line from conceivable to plausible."  Iqbal, 556 U.S. at 680 (quoting Twombly, 550 U.S. at 570).

### ii.       Defendants' Knowledge of the Alleged Fraud

Plaintiffs further allege that Defendants knew, or should have known, that they were in violation of the CPMD.  (See Compl. ¶¶ 56, 58, 59 [Doc. No. 1].)  In order to knowingly violate the CPMD, Defendants must have been aware of the State of Minnesota's prohibition of the corporate practice of medicine.  Plaintiffs contend that Defendant Guzhagin had actual or constructive knowledge of the existence of the CPMD as evidenced by two facts.  First, Defendant Guzhagin acknowledged the CPMD in Guzhagin v. State Farm Mut. Auto. Ins. Co., 566 F. Supp. 2d 962, 970 n.8 (D. Minn. 2008), a previous lawsuit to which he was a party.  (See id. ¶ 59.)  Second, Plaintiffs contend that Defendant Guzhagin knew that the corporate practice of medicine was not permitted in Minnesota based on a "Minnesota Board of Chiropractic Examiners notice indicating that as of January 1, 1999, all owners and decision makers of professional firms must be comprised of persons licensed to practice the professions designated in Minnesota chapter 319B." (Id. ¶ 59.)  Plaintiffs did not submit a copy of this notice as an exhibit, nor did they provide a citation for the Court to obtain this document, if the notice was considered

public record.  Nonetheless, at this stage of the proceedings, the Court finds that Plaintiffs

need not provide such documentation to supplement their claim.  Plaintiffs further allege

that because the Defendants knew of the CPMD and allowed Defendant Ibrahim, and/or

Defendant Southwest Management, to maintain ownership over the Defendant Clinics,

Defendants therefore knew or should have known that Defendant Clinics were operating

illegally and in violation of the CPMD in the State of Minnesota.  (See id. ¶ 56.)

The Court finds that Plaintiffs' allegations regarding (1) Defendants' knowledge of

the existence of the CPMD, and (2) Defendants' knowledge of their violation of the CPMD,

amount to more than "mere conclusory statements."  If Defendant Guzhagin did in fact

receive notice informing him about the CPMD in Minnesota, then Defendant Guzhagin

likely had constructive knowledge of the CPMD.  (See id. ¶ 59.)  Moreover, Plaintiffs

contend that Defendants had specific reason to know about the CPMD because of

Defendant Guzhagin's arguments about the doctrine in 2008, during a different legal

proceeding.  (See id. ¶ 59.)  The Court agrees that, if taken as true, the fact that Defendant

Guzhagin discussed the CPMD in 2008 sufficiently demonstrates that Defendants knew

about the prohibition of the corporate practice of medicine.  Thus, Plaintiffs have plausibly

alleged that Defendants either were aware, or should have been aware, that Ibrahim's or

Southwest Managements' ownership of Defendant Clinics violated the CPMD.  (See id. ¶¶

56, 58, 59.)  These allegations are sufficient to "to raise a right to relief above the

speculative level."  Twombly, 550 U.S. at 555.

### iii.    Particularity of Alleged Mail and Wire Fraud

Plaintiffs additionally allege that Defendants represented to Plaintiffs, by mail and wire, that they were not operating in violation of the CPMD.  (See Compl. ¶¶ 61, 63 [Doc. No. 1].)  Plaintiffs substantiate their mail fraud allegation by contending that Defendants' billing representatives submitted HCFA-1500 forms and/or invoices via U.S. Postal Service to Plaintiffs, for the purpose of obtaining money under the false pretense that Defendants were properly incorporated, properly owned, and legally authorized to render treatment in the State of Minnesota.  (See id. ¶ 61.)  Similarly, Plaintiffs allege that Defendants' billing representatives submitted HCFA-1500 forms and/or invoices *via wire* to Plaintiffs, for the purpose of obtaining money under the false pretense that Defendants were properly incorporated, properly owned, and legally authorized to render treatment in the State of Minnesota.  (See id. ¶ 63.)

Pursuant to Federal Rule of Civil Procedure 9(b), alleged fraudulent racketeering activity must be pled with particularity.  See Fed. R. Civ. P. 9(b); Ill. Farmers, 2014 WL 4104789, at *5 (citing Crest Constr. II, 660 F.3d at 353).  In United States ex rel. Joshi v. St. Luke's Hospital, Inc., the anesthesiologist-plaintiff brought a qui tam action against a medical provider alleging that the provider submitted false or fraudulent claims for Medicare reimbursement, in violation of the False Claims Act ("FCA").  See 441 F.3d 552, 553–54 (8th Cir. 2006).  Specifically, the plaintiff alleged that the medical provider: (1) requested and received Medicare reimbursement from the government for services performed at a higher rate than the provider was entitled to; (2) sought reimbursement for

supervised work, when in fact such work was unsupervised, in violation of state law; and

(3) knowingly submitted false claims to the government for services that were not

performed and for supplies that were not provided. Id. at 554. The plaintiff made vague

allegations based on "information and belief" (id. at 558) and based on an "original

source" (id. at 554), but failed to indicate the actual "basis for knowledge concerning the

alleged submission of fraudulent claims" (id. at 558) or the precise activity that violated

the FCA (id.). Moreover, the plaintiff had "no direct connection to the hospital's billing

or claims department and could only speculate that false claims were submitted." See

Thayer, 765 F.3d at 917.

In Joshi, the United States Court of Appeals for the Eighth Circuit affirmed the

dismissal of the plaintiff's fraud claims, explaining that the complaint failed to satisfy

Rule 9(b)'s particularity requirement. See 441 F.3d at 560–61. The plaintiff failed to

provide a factual basis for his fraud claims; and thus, his allegations lacked sufficient

indicia of reliability to satisfy Rule 9(b).

In United States ex rel. Thayer v. Planned Parenthood of the Heartland, the

plaintiff also brought a qui tam action against a medical provider alleging that the

provider submitted false or fraudulent claims for Medicaid reimbursement, in violation of

the FCA. See 765 F.3d 914, 915 (8th Cir. 2014). Specifically, the plaintiff alleged that

the medical provider: (1) filed claims for unnecessary quantities of prescription

medications that were often prescribed but not received by patients; (2) sought

reimbursement for services in violation of federal law and instructed patients to give false

information to medical professionals at other hospitals to induce those professionals to file claims for services; (3) filed claims for the full amount of services that had already been paid, in whole or in part, by "donations" coerced from patients; and (4) "upcoded," or filed claims for more expensive services than were actually performed.  See id.

As the medical center's manager, the plaintiff oversaw the billing and claims systems.  Id. at 917.  Therefore, she was able to allege with particularity the details of the first and third claims, including the names of those involved, the relevant time period, and the methods used to commit the alleged fraud.  Id. at 919.  However, she failed to allege such details for her second and fourth fraud claims.  In support of her second claim, the plaintiff did not allege that she had access to, or knowledge of, other hospitals' billing practices.  Id.  In support of her fourth fraud claim, the plaintiff made only "conclusory or generalized allegations" of upcoding and did not allege any details of who was involved, when the upcoding occurred, and what type of services were involved.  Id. at 920.  Given these allegations, the Eighth Circuit held that only the Plaintiff's first and third claims were pled with enough particularity to survive dismissal.  Id. at 917–21.  The Thayer Court further stated that "[plaintiffs] whose allegations lack sufficient indicia of reliability should be required to plead representative examples of the false claims because their allegations are more likely to be unfounded," and that, "[i]n contrast, a [plaintiff] who provides sufficient indicia of reliability to support her allegations that false claims were submitted, such as by pleading details about the defendant's billing practices and

pleading personal knowledge of the defendant's submission of false claims, fulfills Rule 9(b)'s objective of protecting the defendant from baseless claims." Id. at 918.

Here, Plaintiffs provide sufficient indicia of reliability to support their allegations that fraudulent claims were submitted; and thus, under Thayer, Plaintiffs need not plead representative examples of fraudulent claims. See id. The indicia of reliability include: the identities of the entities and individuals involved; statements from confidential informants; deposition testimony from prior litigation; and the methods used to commit the alleged fraud. Moreover, Plaintiffs clearly allege the content of the alleged fraud, namely, the ownership misrepresentation included in each HCFA-1500 form submitted to Plaintiffs. Because the who, what, where, when, and how of the alleged fraud is sufficiently clear without representative samples, the fraud alleged in this case is distinguishable from the non-particular fraud alleged in Joshi and Thayer.

In sum, Plaintiffs plausibly allege that Defendants violated the CPMD, and knew that they were violating the CPMD. Additionally, Plaintiffs allege, with the requisite particularity, that Defendants committed mail fraud or wire fraud by representing to the insurers that they were not violating the CPMD.

### b. Enterprise

Plaintiffs not only plausibly allege the predicate acts to support their RICO claim, but they also plausibly allege that Defendants conducted an enterprise that was distinct from the alleged pattern of racketeering. As noted above, in order to plead a viable RICO claim, a

Plaintiff must allege that "an enterprise" conducted a pattern of racketeering activity.  See

Ill. Farmers, 2014 WL 4104789, at *5.

A RICO enterprise "'includes any individual, partnership, corporation, association,

or other legal entity, and any union or group of individuals associated, in fact, although not a

legal entity.'"  Crest Constr. II, 660 F.3d at 354 (quoting 18 U.S.C. § 1961(4)).  "An

association-in-fact enterprise must have at least three structural features: a purpose,

relationships among those associated with the enterprise, and longevity sufficient to permit

these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938,

946 (2009) (finding that a jury instruction containing these three structural features was

correct and adequate).  Additionally, the enterprise's structure must be distinct from the

alleged racketeering activity.  "Under longstanding Eighth Circuit precedent, an alleged

RICO enterprise must also have 'an ascertainable structure distinct from the conduct of a

pattern of racketeering.'"  Ill. Farmers, 2014 WL 4104789, *14 (citing Crest Constr. II, 660

F.3d at 354).

Plaintiffs claim that collectively, Defendant Guzhagin, the Defendant Clinics,

Defendant Ibrahim, and Defendant Southwest Management, comprise an association-in-fact

enterprise.  (Compl.  ¶ 53 [Doc. No. 1].)  Specifically, Plaintiffs allege that all of the

Defendant Clinics are connected with one another and were incorporated by, and are legally

owned by, Defendant Guzhagin.  (See id. ¶¶ 15, 17, 18, 21.)  Plaintiffs contend that

"Defendant Clinics commingle funds between their various financial accounts," and that

they "operate in an underfunded fashion and pay expenses for one clinic from another

clinic's operating account." (See id. ¶ 25.) Further, Plaintiffs allege that Defendant Clinics use the same or similar patient care record systems, "grant direct and indirect access to confidential patient care records to chiropractors working at other Defendant Clinics, and recruit staff chiropractors to service other Defendant Clinics besides their primary clinic." (See id.) Plaintiffs argue that the Defendant Clinics and Defendant Guzhagin are also connected to Defendant Ibrahim and Defendant Southwest Management because Ibrahim and/or Southwest Management are either legal owners, or owners-in-fact, of the Defendant Clinics, and Defendant Clinics are partially or wholly funded by Defendant Ibrahim and/or Defendant Southwest Management. (Id. ¶ 25–26.)

In sum, Plaintiffs plausibly allege the "existence of an enterprise that extend[s] beyond the minimal association surrounding the pattern of racketeering activity." Cf. Stephens, Inc. v. Geldermann, Inc., 962 F.2d 808, 815–16 (8th Cir. 1992) (holding that the plaintiff's complaint insufficiently pled a RICO enterprise because although "each member of th[e] group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise, and thus, were not acts of the enterprise"). Aside from the alleged wire and mail fraud, Defendants paid one another's employees and Defendant Ibrahim referred patients to the clinics in order to achieve the alleged shared purpose of defrauding Plaintiffs and their insureds. (Compl. ¶ 50 [Doc. No. 1].)

Read as a whole, Plaintiffs' Complaint also sufficiently alleges that the structure of Defendants' enterprise is distinct from Defendants' alleged racketeering activity. See Crest

Constr. II, 660 F.3d at 354.  Defendants contend that Plaintiffs failed to allege that the

Defendants conducted an enterprise that was distinct from the alleged pattern of

racketeering activity.  (See Defs.' Mem. at 16 [Doc. No. 18].)  Defendants argue that

Plaintiffs allege that "everything about the Clinics was a fraud[, and] [w]ithout this fraud the

entire enterprise would disappear."  (See id. at 17.)  The Court disagrees.  Defendants

erroneously obscure the distinction between (1) the predicate acts alleged, and (2) fraud,

generally.

"In assessing whether an alleged enterprise has an ascertainable structure distinct

from that inherent in a pattern of racketeering," the Court must "determine if the

enterprise would still exist were the predicate acts removed from the equation."  Handeen

v. Lemaire, 112 F.3d 1339, 1352 (8th Cir. 1997).  Here, the predicate acts alleged are

mail fraud and wire fraud.  (See Compl. ¶¶ 60, 62 [Doc. No. 1].)  The enterprise, or the

alleged association-in-fact among Defendants, would still exist even if they did not

commit mail or wire fraud.  Defendants could simply continue to provide medical

services and treatment for patients, and bill patients directly, but not submit the HCFA-

1500 form by mail or wire.

Even if Defendants did not submit the forms by mail or wire, Defendant Clinics

would still: (1) have a purpose; (2) maintain a relationship among Defendants; and (3)

have longevity sufficient to permit Defendants to pursue the enterprise's purpose.  See

Boyle, 556 U.S. at 946.  Plaintiffs allege that Defendants' purpose is to "defraud the

Plaintiffs and its insureds."  (See Compl. ¶ 50 [Doc. No. 1].)  Defendants could still strive to

defraud Plaintiffs' insureds by treating patients, charging them for treatment, and making a profit. This purpose would remain unaltered if they did not submit HCFA-1500 forms via mail or wire.

Similarly, the relationship between Defendants would likely remain the same, as they would continue to pay one another's employees, share profits, and share patient records. And, finally, given the fact that Defendant Clinics employ physicians and chiropractors and provide treatment for patients, the enterprise has the longevity sufficient to permit Defendants to continue to make a profit and/or treat patients. Although, under this hypothetical, Defendant Clinics would still be partaking in the corporate practice of medicine, a violation of the CPMD does not equate to the predicate acts of mail and/or wire fraud.

Defendants' alleged enterprise in this case is similar to the defendants' enterprise in United States v. Lemm, 680 F.2d 1193 (8th Cir. 1982), cert. denied, 459 U.S. 1110 (1983). In Lemm, the defendants allegedly comprised an arson ring that acquired and insured property, burned the property, and then filed fraudulent insurance claims. Id. at 1197. The Eighth Circuit held that the arson ring constituted an enterprise with a structure distinct from the predicate acts of racketeering, because if the court "eliminate[d] for purposes of argument the predicate acts of mail fraud, the evidence still show[ed] an on-going structure which engaged in legitimate purchases and repairs of property as well as acts of arson." Id. at 1201. The Lemm Court explained that the defendants could have accomplished its fraud by hand delivering insurance claims. Id.

While in this case, Defendant Clinics are required by law to submit medical expense

benefits via "uniform electronic transaction standards," and may not submit their claims

by hand, see Minn. Stat. § 65B.54, subd. 1,[7] the alleged facts still demonstrate that

Defendants are part of an on-going structure which engages in fee-for-service care and

treatment for patients, and which could bill patients directly.

In contrast, Defendants' enterprise is distinguishable from the defendants'

enterprises in Stephens, Inc. v. Geldermann, Inc., 962 F.2d 808 (8th Cir. 1992), and

Illinois Farmers, 2014 WL 4104789.  In Stephens, the plaintiff alleged that the defendant, a

commodity futures merchant, failed to follow the Commodity Futures Trading

Commission regulations.  962 F.2d at 810.  The plaintiff's trader made each trade by

placing calls to the defendant on a "dedicated phone line," and then submitting

confirmation mailings.  Id.  The regulations required the defendant to ask the plaintiff's

trader for the number of the account traded and write that number on the order ticket.  Id.

Instead of following this requirement, the defendant permitted the plaintiff's trader to

assign his trades to either the plaintiff's account or the trader's mother's account, "after

[the trader] knew which trades had been profitable."  Id.  The Eighth Circuit held that

---

[7]     Minn. Stat. § 65B.54 states that, "Claims by a health provider [such as one of
Defendant Clinics] defined in section 62J.03, subdivision 8, for medical expense benefits
covered by this chapter shall be submitted to the reparation obligor pursuant to the
uniform electronic transaction standards required by section 62J.536 and the rules
promulgated under that section."  See Minn. Stat. § 65B.54, subd. 1.  In fact, "[p]ayment
of benefits for such claims for medical expense benefits are not due if the claim is not
received by the reparation obligor pursuant to those electronic transaction standards and
rules."  Id.

"[a]bsent the predicate acts of wire and mail fraud, the association-in-fact enterprise which [the plaintiff] alleged had no form or structure."  962 F.2d at 816.

"Unlike the arson ring in <u>Lemm</u>, which was united and defined by activities independent of the predicate acts of mail fraud, the enterprise [in <u>Stephens</u>] was linked and essentially defined by the daily interstate telephone calls and confirmation mailings between [the plaintiff's trader and the defendant]."  <u>Id.</u>  If the court were to "[r]emove these predicate acts of racketeering," then, "the alleged association-in-fact [would] evaporate[]."  <u>Id.</u>  The defendant's enterprise in <u>Stephens</u> is distinguishable from the alleged enterprise in this case for the same reason as it is distinguishable from the enterprise in <u>Lemm</u>.  Absent the predicate acts of mail and wire fraud in this case, Defendants' enterprise would still have a form and structure, as Defendants could continue to provide treatment for patients and bill patients directly, without the use of mail or wire.

Defendants' enterprise is also distinguishable from the defendant's enterprises in <u>Illinois Farmers</u>.  In <u>Illinois Farmers</u>, the plaintiffs alleged that a lay-owned diagnostic imaging company paid kickbacks to chiropractors and chiropractic clinics for referring patients to the defendant's company for imaging scans.  <u>See</u> 2014 WL 4104789, *1.  A court in this District held that the plaintiffs "failed to allege that any of the defendants conducted an enterprise that was distinct from the alleged pattern of racketeering activity," primarily for two reasons.  <u>Id.</u> at *13.  First, the plaintiffs did not allege "that all of the defendants . . . were involved in a single association-in-fact," and even if they had

alleged this fact, the enterprise "would have taken the form of a rimless hub-and-spokes organization" since the defendant clinics were not connected to one another, but instead were only directly connected to the imaging company.  Id. at *14.  The second basis for the court's holding was that the "plaintiffs fail[ed] to allege facts showing that any of the alleged association-in-fact enterprises [were] distinct from the predicate acts of mail or wire fraud committed by those enterprises."  Id.  The Illinois Farmers Court explained that the relationship between the imaging company and the chiropractors and clinics was "made up entirely of fraud [based on the kickback scheme]," and without "that alleged fraud, then, there would be no enterprise."  Id. at *15.

This case is distinguishable from Illinois Farmers on two grounds.  First, here, Plaintiffs allege that all Defendants are involved in a single association-in-fact.  (See Compl. ¶ 25 [Doc. No. 1].)  The alleged enterprise is a rimmed, as opposed to rimless, hub-and-spokes organization, as each clinic is allegedly directly connected to others, as evidenced by the profit and patient record sharing that occurs.  (See id.)  Second, unlike the plaintiffs in Illinois Farmers, here, Plaintiffs allege facts showing that Defendants' enterprise is distinct from the predicate acts of mail and wire fraud.  The relationship between Defendant Clinics is not based solely upon a fraud scheme that relies on mail and wire fraud for execution.  Rather, in this case, Defendant Clinics comprise an enterprise because their purpose is to make a profit from providing services and treatment for patients.  Defendants could continue to run as an enterprise by providing treatment for

patients and billing them directly, without the use of mail or wire.  For instance, the clinics could deliver the bills to patients by hand.

While it is true that Plaintiffs' Complaint states that Defendants "formed an ongoing association <u>for</u> purposes of defrauding the Plaintiffs," (<u>see</u> Compl. ¶ 50 [Doc. No. 1]) (emphasis added), under Eighth Circuit law, the purpose of the enterprise need not be distinct from the overall fraud.  Rather, in order to state an actionable RICO claim, the enterprise need only exist separate from the "predicate acts" alleged.  Accordingly, Plaintiffs sufficiently state an actionable RICO claim to survive Defendants' Motion to Dismiss.

### 2.  Count II: Violation of Minnesota's Corporate Practice of Medicine Doctrine

In Count II, Plaintiffs allege that Defendants violated the CPMD, which prohibits chiropractic clinics from being owned by unlicensed laypersons.  (Compl. ¶¶ 69–78 [Doc. No. 1].)  At this stage of the proceedings, this Court need only address whether Plaintiffs sufficiently allege a violation of the CPMD so as to provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  <u>Twombly</u>, 550 U.S. at 556.

Plaintiffs' Count II is a direct claim for Defendants' alleged violation of the CPMD, as opposed to an indirect claim of Defendants' alleged violation of the CPMD, which is part of Plaintiffs' RICO claim.  The <u>Illinois Farmers</u> Court succinctly analyzed the distinction between a direct and indirect CPMD claim.  The court explained that:

> [A] RICO claim is, at heart, a fraud claim; the allegation is that [the defendants] lied about their violation of the CPMD. [In contrast,] [a] direct claim for violation of the CPMD is, at heart, a contract claim; the allegation is that the enforcement of contracts involving [the defendants] . . . violates public policy because [the defendants] violated the CPMD.

Ill. Farmers, 2014 WL 4104789, at *20. Therefore, Plaintiffs need not plead their CPMD claim with heightened particularity under Rule 9(b).[8]  Contracts, such as insurance agreements, made in violation of the CPMD are voidable if "it is established that the corporation's actions show a knowing and intentional" violation of the CPMD. Id. (quoting Isles II, 725 N.W.2d at 95).  A court will "not void a contract unless it is established that the corporation's actions show a knowing and intentional failure to abide by state and local law." Isles II, 725 N.W.2d at 95.  "Such a rule is consistent with public policy jurisprudence that requires the [C]ourt to determine whether the illegality has so tainted the transaction as to make it void under public policy." Id.

As discussed in regards to Plaintiffs' indirect claim of Defendants' CPMD violation, Defendants argue that Ibrahim and Southwest Management do not have any ownership interest in the clinics, and that Defendants, therefore, have not violated the CPMD. (See Defs.' Mem. at 13–14 [Doc. No. 18].)  Defendants contend that Plaintiffs' allegations are "mere conclusory statements," and do not suffice under the Federal Rules of Civil Procedure. (See id. at 14 (citing Iqbal, 556 U.S. at 678)).  The Court disagrees.

---

[8]    The Court notes that Plaintiffs correctly state that they also need not plead intent to violate the CPMD or the Minnesota Professional Firms Act with particularity, pursuant to Rule 9(b). (See Pls.' Mem. at 14 [Doc. No. 20].)  According to Rule 9(b), "intent . . . and other conditions of a person's mind may be alleged generally." See Fed. R. Civ. P. 9(b).

As the Court found above, Plaintiffs' allegations regarding lay-ownership of the Defendant Clinics amount to more than "mere conclusory statements."  Moreover, Plaintiffs' allegations regarding Defendants' knowledge of the CPMD and knowledge of their violation of the CPMD also amount to more than "mere conclusory statements," given Defendant Guzhagin's legal arguments in Guzhagin, 566 F. Supp. 2d at 970 n.8, and Defendants' allegedly knowing misrepresentations on their HCFA-1500 forms.  (See Compl. ¶¶ 58, 61 [Doc. No. 1].)  Thus, Plaintiffs' CPMD claim is sufficient to "to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

### 3.  Count III: Violation of Minnesota Professional Firms Act

In Count III, Plaintiffs allege that Defendants violated the Minnesota Professional Firms Act ("MPFA") by issuing and/or authorizing legal, or in-fact, ownership interests to persons or companies not licensed to render at least one category of the pertinent professional services.  (Compl. ¶¶ 79–87 [Doc. No. 1].)  Accordingly, Plaintiffs seek a declaratory judgment that Defendants violated the MPFA and a permanent injunction enjoining Defendants from further violating the MPFA.  (See id. at 34.)

The MPFA states that "[o]wnership interests in a professional firm may not be owned or held, either directly or indirectly, except by . . . professionals who, with respect to at least one category of the pertinent professional services, are licensed and not disqualified."  See Minn. Stat. § 319B.07, subd. 1 (emphasis added).  Although Defendant Clinics have record professional ownership, Plaintiffs allege that Defendants' "indirect" ownership is lay.  See Spine Imaging MRI, L.L.C. v. Liberty Mut. Ins. Co., 818 F. Supp. 2d

1133, 1141 (D. Minn. 2011) [hereinafter "Spine Imaging II"] (explaining that because the MPFA includes the word "indirect," record ownership may not be dispositive for determining whether an MPFA violation exists).  Those who practice medicine in knowing violation of the MPFA may also be operating in violation of the CPMD.  See id.

Although neither party discusses this issue, the Court finds it necessary to note that the MPFA does not include an express private cause of action, see Minn. Stat. §§ 319B.01 – 319B.12, or implied private right of action, see Mutual Serv. Casualty Ins. Co v. Midway Massage, Inc., 695 N.W.2d 138, 142–43 (Minn. Ct. App. 2005).  Rather, Defendants' alleged MPFA violation may only form the basis of a violation of the CPMD.  See Spine Imaging II, 818 F. Supp. 2d at 1141 (explaining that because a CPMD claim is based on a corporation knowingly and intentionally failing to abide by state and local law, a violation of the MPFA may be one such state law).  Therefore, Plaintiffs' MPFA claim is actionable only insofar as it forms the basis of Plaintiffs' CPMD claim.

Defendants argue that Plaintiffs' MPFA claim fails because it is a fraud-based claim that is insufficiently particular under Rule 9(b).  (See Defs.' Mem. at 6–7 [Doc. No. 18].)  Plaintiffs, however, contend that a claim based on an MPFA violation is "not rooted in theories of fraud and therefore need not be pled with particularity."  (See Pls.' Mem. at 21 [Doc. No. 20].)  The Court agrees.  Like a claim based on a direct CPMD violation, the Court finds that a claim based on an MPFA violation is also, at heart, a contract claim.  See Ill. Farmers, 2014 WL 4104789, at *20; see also Spine Imaging II, 818 F. Supp. 2d at 1141 (analyzing the validity of the plaintiffs' MPFA claim under a regular Iqbal/Twombly

plausibility standard).  Thus, Plaintiffs need not plead their MPFA claim with heightened particularity pursuant to Rule 9(b).

The Court finds that, under the Iqbal/Twombly standard, Plaintiffs' allegations plausibly amount to a violation of the MPFA, and therefore constitute a plausible CPMD claim, as discussed in Part (III)(B)(2).  Plaintiffs allege that Defendants made elections to operate under the MPFA, knew of the CPMD, but disregarded these laws by issuing in-fact ownership to a lay person and/or lay company.  (See Compl. ¶¶ 83, 87, 88 [Doc. No. 1].)  As the Court discussed in regard to Plaintiffs' Count II, at this stage of the proceedings, Plaintiffs have plausibly demonstrated a knowing and intentional violation of the MPFA, which forms the basis of Plaintiffs' CPMD claim.  Read as a whole, Plaintiffs' allegations sufficiently "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  However, Plaintiffs should amend their Complaint to reflect the fact that this claim is a part of Count II, and is not a distinct cause of action.  Plaintiffs are ordered to amend their Complaint accordingly, within fourteen days of this order.

### 4.  Count IV: Unjust Enrichment

In Count IV, Plaintiffs claim that Defendants would be unjustly enriched if the Court permitted them to retain funds received as a result of MPFA and CPMD violations.  (Compl. ¶¶ 92–97 [Doc. No. 1].)  According to Minnesota law, "[t]he elements of unjust enrichment are: (1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for

38

it." Dahl v. R.J. Reynolds Tobacco Co., 742 N.W.2d 186, 195 (Minn. Ct. App. 2007).

Plaintiffs contend that Defendants held the Defendant Clinics out as legitimate providers of chiropractic care and obtained funds to which they were not entitled and which rightfully belonged to Plaintiffs, in direct violation of the MPFA and CPMD. (See Compl. ¶ 93 [Doc. No. 1].) Plaintiffs allege that this illegally obtained money constitutes a benefit conferred, that the Defendants were aware that this money was conferred upon them, and that allowing them to retain this benefit would be inequitable because they obtained this benefit in violation of Minnesota law. (See id. ¶ 92–97.)

Defendants claim that dismissal of Plaintiffs' Count IV is warranted for two reasons. First, they argue that Plaintiffs' unjust enrichment claim must be pled with particularity because it is grounded in fraud, and that Plaintiffs have failed to adequately do so. (See Defs.' Mem. at 28 [Doc. No. 18].) The Court agrees that because allegations of fraud underlie the unjust enrichment claim, a heightened pleading standard applies. See United States v. Henderson, 2004 WL 540278, at *2 (D. Minn. Mar. 16, 2004). But, unlike Defendants, the Court finds that Plaintiffs sufficiently meet this burden. See supra Part III(B)(1)(a)(iii).

If, after discovery, a factfinder concludes that the funds Plaintiffs paid for the insurance claims were a result of Defendants' MPFA and CPMD violations, then the factfinder would also likely conclude that it would be inequitable for Defendants to retain these funds. Therefore, this Court finds that Plaintiffs' allegations regarding the illegal benefit conferred, the retention of such benefit, and the inequity of allowing Defendants to

retain such benefit amount to more than "mere conclusory statements."  See Iqbal, 556 U.S. at 663.

Defendants' second argument for dismissing Plaintiffs' Count IV is that even if Defendant Clinics' ownership violated the CPMD, Plaintiffs would still be obligated to pay for medically necessary treatment under the No-Fault Act; and thus, Defendants' retention of the paid benefits is not unjust.  (See Defs.' Mem. at 28 [Doc. No. 18].)  The Court disagrees.  While benefits must generally be reimbursed for all reasonable expenses for necessary "medical, surgical, x-ray, optical, dental, chiropractic, and rehabilitative services," see Minn. Stat. § 65B.44, subd. 2, under the No-Fault Act, insurance companies have a right to deny paying benefits based on grounds other than the necessity and reasonableness of the medical treatment.  According to Minn. Stat. § 65B.54:

> A reparation obligor[, or an insurance company,] who rejects a claim for benefits shall give to the claimant prompt written notice of the rejection, specifying the reason.  If a claim is *rejected for a reason other than that the person is not entitled to the basic economic loss benefits claimed*, the written notice shall inform the claimant that the claimant may file the claim with the assigned claims bureau and shall give the name and address of the bureau.

Minn. Stat. Ann. § 65B.54, subd. 5 (emphasis added).  The language of this statutory provision demonstrates that an insurance company may reject a claim for a reason other than "that the person is not entitled to the basic economic loss benefits claimed."  See id. Therefore, an insurance company could plausibly reject a health provider's claim because that health provider or clinic is illegally owned, and the insurance company could simply notify the claimant that he or she could file his or her claim with the assigned claims

bureau, through an administrative like appeals process.  See id.  Accordingly, the Court rejects Defendants' argument that even if Defendants violated the CPMD, retaining the bills paid by Plaintiffs is not unjust.  In sum, Plaintiffs' Count IV survives Defendants' Motion to Dismiss.

### 5.   Count V: Recovery of Minnesota's No-Fault Benefits, Minn. Stat. § 65B.54

In Count V, Plaintiffs claim that, pursuant to Minn. Stat. § 65B.54, Defendant Clinics must return the No-Fault benefits that Plaintiffs paid as a result of Defendants' alleged intentional misrepresentation.  (Compl. ¶¶ 98–104 [Doc. No. 1].)  Plaintiffs argue that Defendant Clinics intentionally misrepresented their ownership and submitted deceptive invoices to Plaintiffs for patient services performed.  (See id. ¶¶ 101, 102.) Plaintiffs contend that they relied on the accuracy of these invoices and paid the claims. (See id. ¶ 93.)

According to Minn. Stat. § 65B.54, Plaintiffs "may bring a cause of action to recover benefits which are not payable, but are in fact paid, because of an intentional misrepresentation of a material fact."  See Minn. Stat. § 65B.54, subd. 4.  Thus, in essence, Plaintiffs' Count V constitutes a fraud claim, and must be pled with Rule 9(b) particularity. See Spine Imagining MRI, L.L.C. v. Liberty Mutual Ins. Co., 743 F. Supp. 2d 1034, 1048 (D. Minn. 2010) [hereinafter, "Spine Imaging I"]  (dismissing counterclaim for recovery of benefits under Minn. Stat. § 65B.54 because the claim was not pled with Rule 9(b) particularity); Allstate Ins. Co. v. Linea Latina de Accidents, Inc., 781 F. Supp. 2d 837, 847

(D. Minn. 2011) (finding that plaintiffs' claim for recovery of no-fault benefits was pled with the requisite Rule 9(b) particularity).

As discussed in relation to Plaintiffs' RICO claim, Plaintiffs have alleged fraud with the sufficient Rule 9(b) particularity.  See supra Part III(B)(1)(a)(iii).  According to Plaintiffs, each claim form submitted was fraudulent because each contained misleading information, insofar as each form implied that the clinics were lawfully owned and operated.

In opposition, Defendants claim that Plaintiffs are not entitled to have the paid No-Fault benefits returned to them, because payment was required, regardless of the clinics' ownership, as long as the expenses were reasonable and were for medically necessary procedures.  (See Defs.' Mem. at 23 [Doc. No. 18].)  They contend that the "single, dispositive question under the law is whether the care the insured received was reasonable and necessary."  (Id. at 24.)  Plaintiffs respond by asserting that the dispositive question, as it applies to this case, is whether the bills were void from the moment they were submitted "as a matter of public policy" since the clinics were lay-owned.  (See Pls.' Mem. at 22 [Doc. No. 20].)  Accordingly, the parties disagree about (1) whether insurance companies may deny payment for reasons other than that the treatment was unreasonable or medically unnecessary, and (2) whether the clinics' ownership is a "material fact," pursuant to Minn. Stat. § 65B.54.

As to whether an insurance company may deny payment for reasons other than the reasonableness and necessity of the medical treatment rendered, the Court reiterates its

finding that, according to Minn. Stat. § 65B.54, subd. 5, an insurance company could plausibly reject a health provider's claim because that health provider or clinic is illegally owned.

As to the significance of the clinics' ownership, the Court holds that the Defendant Clinics' ownership is a "material fact," under Minn. Stat. § 65B.54, because if the clinics were unlawfully owned and operated, then Plaintiffs could conclude that the clinics were not eligible for reimbursement under the No-Fault Act.

Defendants also contend that this Court lacks jurisdiction to decide whether any particular treatment by the Clinics was compensable under the No-Fault Act. (See Defs.' Mem. at 25 [Doc. No. 18].)  Defendants argue that because the No-Fault Act provides for "mandatory submission to binding arbitration" of all No-Fault claims for $10,000 or less, see Minn. Stat. § 65B.525, subd. 1, and because Plaintiffs have not alleged that each claim they paid to each Defendant was in excess of $10,000, the present dispute is subject to mandatory arbitration. (See Defs.' Mem. at 25 [Doc.No. 18].)  Accordingly, they contend that this Court lacks jurisdiction.  (Id.)

The statute in question states, in full:

> The Supreme Court and the several courts of general trial jurisdiction of this state shall by rules of court or other constitutionally allowable device, provide for the mandatory submission to binding arbitration of all cases at issue where the claim at the commencement of arbitration is in an amount of $10,000 or less against any insured's reparation obligor for no-fault benefits or comprehensive or collision damage coverage.

Minn. Stat. § 65B.525, subd. 1.  The language of the statute indicates that mandatory arbitration applies to cases involving a claim *against* an insured's reparation obligor, or an

insurance company.  See id.; see also Spine Imaging I, 743 F. Supp. 2d at 1043.  Thus, mandatory arbitration does not apply where, as here, an insurance company has already paid the claim, and the reparation obligor files suit against a health provider.  See Allstate Ins. Co. v. Linea Latina De Accidentes, Inc., 781 F. Supp. 2d 837, 846 (D. Minn. 2011) (holding that the plaintiff insurance company sufficiently pled a claim under Minn. Stat. § 65B.54, subd. 4).

In Linea Latina, the plaintiff-insurance company brought a Minn. Stat. § 65B.54, subd. 4 claim, similar to Plaintiffs' Count V.  See id.  However, the court did not discuss whether or how the mandatory arbitration provision applied to this claim.  See id.  The court likely determined that it was unnecessary to discuss the applicability of arbitration because rather than an insured suing an insurance company for coverage, the case involved an insurance company suing chiropractic clinics and individuals associated with those clinics. See id.  Because the present dispute does not involve a claim against an insured's reparation obligor to compel payment of benefits, this Court properly has jurisdiction over Plaintiffs' Count V.

### 6.  Count VI: Recovery under Minnesota's Consumer Protection Act, Minn. Stat. § 325F

In Count VI, Plaintiffs allege that Defendant Clinics violated the Minnesota Consumer Protection Act ("CPA"), Minn. Stat. § 325F, by falsely representing the legality of their ownership to Plaintiffs and to the public.  (Compl. ¶¶ 105–12 [Doc. No. 1].) According to the CPA:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable.

<u>See</u> Minn. Stat. § 325F.69, subd. 1.  Although, generally, the Minnesota Attorney General enforces the CPA, <u>see</u> Minn. Stat. § 8.31, subd. 1, a private party may "bring a civil action" to recover damages from violations of the CPA.  <u>See</u> Minn. Stat. § 8.31, subd. 3(a).

Defendants argue that Plaintiffs' CPA claim fails for three reasons.  First, they contend that even taking Plaintiffs' allegations as true, Defendants did not affirmatively misrepresent their ownership on the HCFA-1500 forms, rather, they merely omitted this information.  (<u>See</u> Defs.' Mem. at 26 [Doc. No. 18].)  Second, Defendants claim that Plaintiffs only assert legal conclusions about Defendant Clinics' ownership, and fail to allege sufficient facts to substantiate their claim.  (<u>See</u> <u>id.</u>)  Finally, Defendants also assert that Plaintiffs fail to state an actionable claim under the CPA because the recovery Plaintiffs seek will not benefit the public, as is required under law.  (<u>See</u> <u>id.</u> at 27 [Doc. No. 18].)  The Court addresses each of these arguments in turn.

As to the distinction between an affirmative misrepresentation and an omission of material facts, the Court finds that Defendants argument fails.  First, the Court reads the notifications on the HCFA-1500 form as requiring health providers to not violate the law when completing the forms.  Thus, assuming Defendants were corporately owned, by completing and submitting the HCFA-1500 forms, Defendants' disregard of their ownership status qualified as an affirmative misrepresentation.  Moreover, Defendant Guzhagin

affirmatively stated to Plaintiffs in a letter in 2013 that he is the sole owner of the clinics. (Compl. ¶ 61 [Doc. No. 1].)  Thus, even if the Court interprets Defendants' failure to clarify their ownership status in the HCFA-1500 forms as an omission rather than a misrepresentation, Defendants, through their legal owner, Dr. Guzhagin, affirmatively misrepresented their ownership.

As to the plausibility of Plaintiffs' claims, the Court finds that similar to Plaintiffs' RICO claim, unjust enrichment claim, and No-Fault fraud claim, Plaintiffs plead fraud with the requisite particularity under Rule 9(b).  Consistent with the Court's earlier findings, the Court finds that Plaintiffs sufficiently demonstrate that Defendants misrepresented the legality of their ownership to the public.

Finally, in regard to Defendants' argument that Plaintiffs fail to state an actionable claim under the CPA because the recovery Plaintiffs seek will not benefit the public, the Court disagrees with Defendants.  Plaintiffs who bring a cause of action under the CPA as a "private attorney general" must demonstrate that the action is brought for the benefit of the public.  See Ill. Farmers, 2014 WL 4104789, at *19, (quoting Overen v. Hasbro, Inc., No. 07-cv-1430 (RHK/JSM), 2007 WL 2695792, at *2 (D. Minn. Sept. 12, 2007)).  In determining if a lawsuit is brought for the benefit of the public, the Court must look to the relief sought by the plaintiff in addition to the form of the alleged misrepresentation.  See Illinois Famers, 2014 WL 4104789, at *19 (quoting Zutz v. Case Corp., No. 02-cv-1776 (PAM/RLE), 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003)).  If the recovery sought only benefits the plaintiff, the Court will find no public benefit.  Id.  "Although there exists

no hard-and-fast rule, a public benefit typically will be found when the plaintiff seeks relief primarily aimed at altering the defendant's conduct (usually, but not always, through an injunction) rather than seeking remedies for past wrongs (typically through damages)." Buetow v. A.L.S. Enters., Inc., 888 F. Supp. 2d 956, 961 (D. Minn. 2012).

Plaintiffs seek actual damages in excess of $75,000 in connection with their consumer-fraud claim. (See Compl. ¶ 111 [Doc. No. 1].) Defendants argue that because Plaintiffs only seek compensatory damages for Count VI, Plaintiffs do not seek relief that would benefit the public. (See Defs.' Mem. at 27 [Doc. No. 18].) The Court disagrees. In addition to damages for Count VI, Plaintiffs generally seek "a permanent injunction enjoining [Defendant Clinics] from further violations of the corporate practice of medicine doctrine and Minnesota Professional Firms Act." (Compl. at 34 [Doc. No. 1].) Such an injunction would have the effect of preventing the Defendant Clinics from continuing to misrepresent to the public that they are lawfully owned and operated, and may potentially result "in the cessation of the clinics' operation." (See Pls.' Mem. at 23 [Doc. No. 20].) As this injunction seeks to alter Defendants' conduct, this relief would benefit the public. See Buetow, 888 F. Supp. 2d at 961. Accordingly, the Court finds that Plaintiffs have adequately alleged the existence of consumer fraud in violation of the CPA, and may properly bring this action as private attorneys general. See Ill. Farmers, 2014 WL 4104789, at *19.

### 7.  Count VII: Common Law Fraud

In Count VII, Plaintiffs contend that Defendants committed common law fraud by falsely representing the legality of their ownership to Plaintiffs.  (Compl. ¶¶ 113–19 [Doc. No. 1].)  Defendants argue that all of Plaintiffs' fraud based claims, including their common law fraud claim, should be dismissed because Plaintiffs have not met the requisite pleading standard under Rule 9(b).  (See Defs.' Reply at 8 [Doc. No. 22].)  Specifically, Defendants claim that Plaintiffs must allege "first-hand knowledge about [Defendants'] ownership [fraud]," or how the clinics' ownership was transferred from Dr. Guzhagin, the paper owner, to Defendant Ibrahim, the alleged owner-in-fact.  (See id.)  Thus, Defendants assert that the "Complaint does not have the details that would allow Defendants to respond specifically and quickly to the allegations."  (See id.)  The Court disagrees.

Rule 9(b) does not require Plaintiffs to allege the precise mechanics of the allegedly fraudulent ownership and transfer of ownership.  Rather, Plaintiffs need only plead "such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result."  Thayer, 765 F.3d at 916.  Plaintiffs meet this burden by alleging facts that, read in the light most favorable to Plaintiffs, demonstrate that Defendant Clinics were run as a single enterprise, or association-in-fact; and Ibrahim or his lay company, Southwest Management, was the owner-in-fact of this enterprise given Ibrahim's close personal and business relationship with Defendant Clinics.  Plaintiffs' common law fraud claim is virtually identical to their unjust enrichment

claim, their No-Fault fraud claim, and the fraud violation underlying their RICO claim. The Court previously analyzed the sufficiency of these claims and determined that they were plausible, and alleged with sufficient particularity under Rule 9(b). Accordingly, the Court finds that Plaintiffs adequately plead their common law fraud claim.

### 8.  Count VIII: Negligent Misrepresentation

Finally, in Count VIII, Plaintiffs claim that Defendants' representation regarding the legality of their ownership amounts to negligent misrepresentation. (Compl. ¶¶ 120–25 [Doc. No. 1].) According to Minnesota law, the definition of negligent misrepresentation involving pecuniary loss is:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Florenzano v. Olson, 387 N.W.2d 168, 174 n.3 (Minn. 1986) (citing Bonhiver v. Graff, 248 N.W.2d 291, 298–99 (Minn. 1976)). "[N]egligent misrepresentation involving damages for pecuniary loss applies primarily to business situations in which false information is supplied to guide others in business transactions and a pecuniary loss is suffered." Smith v. Brutger Cos., 569 N.W.2d 408, 413–14 (Minn. 1997). Plaintiffs allege that Defendants "failed to use reasonable care or competence in communicating billing information to Plaintiffs" because Defendants implied that they were legally owned and operating in accordance with state and federal law and were entitled to reimbursement under the No-Fault Act. (See Compl. ¶ 122 [Doc. No. 1].)

49

Defendants argue that Plaintiffs' negligent misrepresentation claim fails for four reasons: (1) Plaintiffs only allege that Defendants' omitted true information, as opposed to submitting false information; (2) Plaintiffs failed to plead that Defendants had a duty to disclose their true ownership information; (3) even if Defendant Clinics' ownership was corporate, Plaintiffs did not have a right to refuse to pay the benefits; and (4) damages did not result from the alleged negligent misrepresentation because "any sums spent by Plaintiffs would have been spent regardless of Defendants' ownership structure." (See Defs.' Mem. at 29–30 [Doc. No. 18].)  The Court addresses each of these arguments below.

Defendants' first and second arguments are intertwined.  In order "[f]or an omission of a fact to constitute negligent misrepresentation, 'there must first be a duty, either legal or equitable, to disclose that fact.'"  Ill. Farmers, 2014 WL 4104789, at *18 (quoting Hurley v. TCF Banking & Savings, F.A., 414 N.W.2d 584, 587 (Minn. Ct. App. 1987)).  In Illinois Farmers, one of the reasons that the court dismissed the plaintiffs' negligent misrepresentation claim was because it was "far from clear" that the defendants had a duty to disclose to plaintiffs that they were violating the CPMD or paying kickbacks to chiropractors.  See id.  In fact, the court explained that the defendants may have been "foreclosed" from submitting this additional information on the forms because the forms "might . . . provide a ceiling" as to what information is relevant.  See id. at n.13.  The court noted that "[i]mposing a duty on healthcare providers to submit information in addition to what is required by the [HCFA-1500] form would arguably undercut" the rationale that the form is intended to "expedite claims processing by ensuring that

claimants provide[,] in a uniform format[,] only the information needed by insurers to process their claims."  Id.

The Court respectfully disagrees with the Illinois Farmers Court's analysis.  The defendants in Illinois Farmers, and Defendants in this case, likely had a duty to disclose the missing information to Plaintiffs.  According to longstanding Minnesota precedent, a party to a transaction does not have a duty to disclose material facts as a general rule, but "special circumstances may dictate otherwise."  Richfield Bank & Trust Co. v. Sjogren, 244 N.W.2d 648, 650 (Minn. 1976).  For example, a party must say enough in order to prevent his words from misleading the other party.  Newell v. Randall, 19 N.W. 972, 972–73 (Minn. 1884).  Additionally, when a party has special knowledge of material facts to which the other party does not have access, that party may have a duty to disclose those facts to the other party.  See Richfield Bank, 244 N.W.2d at 650 (citing Marsh v. Webber, 13 Minn. 109 (1868)).

Here, by allegedly falsely representing to Plaintiffs, through the submission of HCFA-1500 forms, that Defendants were eligible for reimbursement under the No-Fault Act, Defendants surely failed to say enough to prevent their words from misleading Plaintiffs.  In fact, Defendants likely had a duty to *not* complete and submit the HCFA-1500 forms because two notices on the form expressly warned that health care providers that filed claims that contained "any misrepresentation or any false, incomplete or *misleading* information," may be subject to fines or imprisonment.  (See Gillette Aff., Ex. A [Doc. No. 19-1]) (emphasis added).

Moreover, reading Plaintiffs' allegations as true, Defendants had special knowledge

of the fact that they were not operating in accordance with the CPMD and the MPFA and were not eligible for reimbursement by Plaintiffs under the No-Fault Act – information to which Plaintiffs did not have access.  Given these special circumstances, the Court finds that Defendants' alleged omission of true information constitutes negligent misrepresentation because Defendants had a duty to disclose to Plaintiffs that they were not, in fact, legally owned and operating in accordance with state and federal law.[9]

Defendants' third basis for dismissing Plaintiffs' negligent misrepresentation claim is that even if Defendant Clinics' ownership was corporate, Plaintiffs did not have a right to refuse to pay the benefits.  (See Defs.' Mem. at 29 [Doc. No. 18].)  Again, the Court disagrees.  As explained in detail above, according to Minn. Stat. § 65B.54, subd. 5, an insurance company could plausibly reject a health provider's claim because that health provider or clinic is illegally owned.  See supra Part III(B)(4), (5).  Thus, if Plaintiffs knew that Defendant Clinics had corporate or lay ownership, Plaintiffs would have had a right to refuse to pay the benefits requested.

Finally, Defendants contend that Plaintiffs' negligent misrepresentation claim requires dismissal because damages did not result from the alleged fraud since "any sums

---

[9]      In Defendants' brief, they argue not only that they did not have a duty to disclose their ownership to Plaintiffs, but also that Plaintiffs failed to even plead that Defendants had such a duty.  (See Defs.' Mem. at 29 [Doc. No. 18].)  Insofar as Defendants contend that it is Plaintiffs' burden to plead that Defendants had such a duty to disclose, the Court agrees.  Plaintiffs' burden to plead Defendants' duty is encompassed within the elements of a prima facie negligent misrepresentation claim.  However, insofar as Defendants argue that Plaintiffs failed to meet this burden, the Court disagrees.  The Court reads the Complaint as a whole as alleging that Defendants had a duty to disclose their corporate ownership structure given Defendants' special knowledge and their intent to defraud Plaintiffs by withholding their special knowledge.

spent by Plaintiffs would have been spent regardless of Defendants' ownership structure."
(See Defs.' Mem. at 29–30 [Doc. No. 18].)  Pursuant to Minnesota law, Defendants are only
subject to liability for negligent misrepresentation if their misrepresentation causes
"pecuniary loss."  Florenzano, 387 N.W.2d at 174 n.3 (Minn. 1986); Smith, 569 N.W.2d
at 413–14.

In Illinois Farmers, the court's second ground for dismissing the plaintiffs' negligent
misrepresentation claim was because the plaintiffs had not "adequately alleged that [they]
detrimentally relied" on the misleading claims forms.  See 2014 WL 4104789, at *18.  This
case is distinguishable from Illinois Farmers.  Here, Plaintiffs adequately allege that they
detrimentally relied on the incomplete and misleading HCFA-1500 forms.  Plaintiffs state
that Defendant Clinics' ownership influenced whether Plaintiffs "voluntarily issue[d]
payment."  (See Compl. ¶ 114 [Doc. No. 1].)  Thus, reading the Complaint as a whole,
Plaintiffs allege that they would not have paid the claims had they known that the claims
were void because of Defendants' corporate ownership.  (See id.)

Insofar as Defendants argue that Plaintiffs' claim fails because Plaintiffs would have
paid the same amount to other health care providers, which are not corporately owned, the
Court finds this argument unavailing.  Plaintiffs must only show that they suffered
pecuniary loss caused by their justifiable reliance on Defendants' false information.  See
Florenzano, 387 N.W.2d at 174 n.3 (Minn. 1986).  However, Plaintiffs are not required to
demonstrate that the same sum of money would not have been paid to a legally valid health
care provider that would have otherwise provided treatment for their insureds.  See id.

In sum, all of Defendants' arguments fail to show that Plaintiffs' negligent misrepresentation claim requires dismissal.  Additionally, Plaintiffs plausibly allege that Defendants "fail[ed] to exercise reasonable care or competence in obtaining or communicating the[ir ownership] information."  See Florenzano, 387 N.W.2d at 174 n.3. The same facts Plaintiffs allege to demonstrate fraud are adequate to show that, at a minimum, Defendants failed to use reasonable care when they falsely represented, through their HCFA-1500 forms, that they were legally owned and were entitled to reimbursement under the No-Fault Act.  Thus, the Court finds that Plaintiffs adequately plead their negligent misrepresentation claim.

## C.  Federal Court Jurisdiction for State Law Claims

Defendants argue that Plaintiffs' claims should be dismissed for lack of subject matter jurisdiction.  (See Defs.' Mem. at 9 [Doc. No. 18].)  They contend that this Court does not have federal question jurisdiction because Plaintiffs' RICO claim fails and the Declaratory Judgment Act is not a basis for federal question jurisdiction for Plaintiffs' remaining state law claims.  (See id. at 8.)  Defendants further argue that diversity jurisdiction does not exist and that supplemental jurisdiction cannot be exercised once the Court no longer has original jurisdiction.  (See id. at 8–9.)

As to federal question jurisdiction based on the Declaratory Judgment Act, Plaintiffs do not appear to allege that the Declaratory Judgment Act provides this Court with federal question jurisdiction over their remaining state law claims.  In any event, courts have long understood that the Declaratory Judgment Act is a procedural, not a jurisdictional, statute.

Missouri ex. rel. Missouri Highway and Transp. Com'n v. Cuffley, 112 F.3d 1332 (1997),

(citing Franchise Tax Bd. v. Const. Laborers Vacation Trust, 463 U.S. 1, 15–16 (1983)).

In regard to federal question jurisdiction based on Plaintiffs' RICO claim, the Court

disagrees with Defendants.  As the Court found above, Plaintiffs adequately plead a RICO

claim.  See supra Part (III)(B)(1)(b)(6).  Therefore, the Court has federal question

jurisdiction over Count I.

As to Counts II through VIII, the Court finds that it has supplemental jurisdiction.

Pursuant to 28 U.S.C. § 1367, in a civil action where a court has original jurisdiction, such

as federal question jurisdiction, a district court shall have supplemental jurisdiction "over all

other claims that are so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy under Article III of the United States

Constitution."  See 28 U.S.C. § 1367.  However, the Court may decline to exercise

supplemental jurisdiction if, at least, one of four exceptions apply.  See id. § 1367(c).

Claims arising from a scheme of fraud allegedly perpetrated by the same over-

arching enterprise form the same case or controversy.  See, e.g., 4 K&D Corp. v. Concierge

Auctions, LLC, 2 F. Supp. 3d 525, 545–46 (S.D.N.Y. 2014) (holding that supplemental

jurisdiction could be exercised over a state law claim where that claim was based on the

same alleged acts that constituted the elements of the federal law claim); U.S. Fire Ins. Co.

v. United Limousine Serv., Inc., 328 F. Supp. 2d 450, 453 (S.D.N.Y. 2004) (holding that §

1367(a) required the court to hear a state law claim because the claim arose from the same

fraud scheme that gave rise to a federal fraud claim that the plaintiffs brought, and over

which the court had original jurisdiction).  Applying this standard here, Plaintiffs' Count II through VIII are all claims that allegedly arise from the fraud that Defendants' enterprise perpetrated.

This Court, therefore, may exercise supplemental jurisdiction over all of Plaintiffs' state law claims, as long as one of the four exceptions in 28 U.S.C. § 1367(c) does not apply.  The most relevant exception, and the one raised by Defendants, states that a court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction."  See 28 U.S.C. § 1367(c)(1).

Defendants argue that this Court cannot exercise supplemental jurisdiction because all of the federal claims, namely the RICO claim, have been dismissed.  (See Defs.' Mem. at 10 [Doc. No. 18].)  In support, Defendants cite to Hervey v. County of Koochiching, 527 F.3d 711, 726–27 (8th Cir. 2008), and Powell v. Johnson, 855 F. Supp. 2d 871, 877 (D. Minn. 2012).  However, the courts' holdings in Hervey and Powell are inapposite.  In both cases, claims of original jurisdiction had been dismissed and the courts' discussion was limited to dismissal of pendent state law claims.  See Hervey, 527 F.3d at 726; Powell, 855 F. Supp. 2d at 877.  Here, claims of original jurisdiction have not all been dismissed. Specifically, Plaintiff's RICO claim, or Count I, was not dismissed.  Because a claim of original jurisdiction exists before the Court, the Court exercises supplemental jurisdiction over all of Plaintiffs' remaining state law claims.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Defendants' Motion to Dismiss [Doc. No. 8] is **DENIED.**

2.  As set forth in this Order, Plaintiffs are ordered to amend their Complaint
    within 14 days to reflect the fact that Count III forms the basis for Count
    II, and is not a distinct cause of action.


Dated: February 13, 2015                s/Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge